Good morning, Your Honor. Noah Wexler on behalf of the appellant. May it please the Court. Can you pronounce your client's name for me, please? My client's name is Richard Bosarge. Bosarge, okay. I would like to discuss this morning three issues that arose from a final judgment following a jury trial before Judge Malazzo involving a Jones Act claim and claims for maintenance and cure brought by Richard Bosarge. This is Employer Cheramie Marine. The three issues I'd like to discuss are the jury's finding related to the appellee's affirmative defense based upon the McCorpin case, the confusion caused by the first jury interrogatory on the verdict form submitted, and finally, the prejudicial error caused by the admission of testimony from appellee's expert witness based upon an MRI film that was in defendant's possession, not produced to appellant at any time during the discovery process. I'd like to start first with the McCorpin issue. Can we even address the sufficiency of the evidence, given that you didn't properly preserve it in the trial court under the Unitherm case? Your Honor, I believe that the issue, even though we did not move for a judgment notwithstanding the verdict, can be addressed because of the plain error involved in the jury's finding. This was an affirmative defense, and given the necessary deference to the jury's finding, it can still be examined because there was conclusive evidence that the appellant was fully fit for duty and there was an absence of evidence that the appellee would not have hired or that the hiring would have been delayed. This court has examined the McCorpin doctrine on multiple occasions, and the parties agree with the framework and the factors that are applied under the McCorpin doctrine. The standard of review is a question of law for us. I mean, you can't agree on it. As well, Unitherm suggests we just lack the power to even address something in this context that's not specifically preserved. So do you have anything? I know we've had some cases where we've said, well, if we did look at plain error, you'd still lose. But do we have a case where we said, well, you didn't preserve it, but on plain error you win since Unitherm? I'm not aware of a case that states that, Your Honor. My issue that I want to raise, though, is that the fact that the court has examined the McCorpin scenario on multiple occasions, why is this case different from Joust or some of the other ones that are cited by both parties in this case? And I think the particularly unique issue here that I have not seen addressed by this circuit is that what we have here is a prior undisclosed medical fact where the plaintiff had prior complaints of back soreness. He sought medical treatment for that in 2011. And intervening between that time and his application for employment, he sought other employment where he was sent for an MRI, which was reviewed and noted as being normal, and he was cleared for full duty. He also applied with the Coast Guard for his Coast Guard license, and he was cleared for that. And so what we have here is a circumstance different than Joust, different from Brown, different from McCorpin, where there was an undisclosed medical fact. But in the interim of time that had passed, he had been cleared, and the testimony at trial from the corporate representative for Appellee and from the nurse examiner who did the pre-employment physical for Cherami Marine was, if that had been disclosed that he had a prior problem, that was something that would do a further inquiry on, and their further inquiry would be to find out whether or not he'd had an MRI or a clearance from his doctor. And here we have that in the interviewing time. And so that's what's different about this case from other cases that the circuit has examined. And I think that because there was no evidence put on that he would not have been hired with this clear MRI and that he'd never missed work, he'd never had a positive MRI prior to this incident, and he'd never failed a physical, this is a situation where the affirmative defense was not supported by the evidence and the jury's finding was plain error. And so we'd ask for the purposes of that cause of action to be remanded for a new trial on the issue. The second issue that I'd like to talk about is the verdict form. I think the trial court did an excellent job. You know, if we conclude that the trial court was correct to say kind of was there an accident, meaning did something happen, and the jury said no, would there even be a need to reach the McCormick defense? Because if nothing happened to him, why are they paying maintenance and cure? If I understand the question correct, you're asking if there was the first question of whether an accident happened and that conditioned all the subsequent questions? Well, I'm asking you. I mean, if nothing happened to him, maintenance and cure is a no-fault kind of take care of the guy, but something still has to happen. He has to get sick. He has to fall. So even if it's his fault that he falls, he still can get maintenance and cure. I get that. It's no fault. But it still requires something. Something has to happen. You don't just get it for walking in one day and going, hi, I want some maintenance and cure. And if that something didn't happen, in other words, he just lied and made up a story, does he even get that? Does he even get the maintenance and cure? I understand your question. Okay. And I believe that with respect to the maintenance and cure claim, as long as his injury or illness arises in the service of the vessel, which is undisputed based upon the record at trial, he reported the entity, he reported back pain, he reported what the defendants described as sea sickness, and he was basket transferred off this vessel and then went to shore and sent for medical treatment at a doctor that his employer sent him to who ultimately determined he needed epidural steroid injections and had a herniated disc. And so there was an illness or injury that arose during his service of the vessel. When it came to the interrogatory, the court chose to balkanize the question in two parts. And in addition to doing that, they conditioned each question after the first, meaning if they didn't find that there was a particular pinpoint accident, they didn't answer any of the other questions. And here the evidence was during the voyage, initially my client, Mr. Bosarge, was at the helm and there was rough seas and he went to open waters and determined that he believed it was too dangerous. He reported this to the primary captain, Captain Nelson. Captain Nelson agreed with him at that point. They went to shallow waters, at which point he was off shift and he was around the vessel in different areas on video and then ultimately went to his bunk room. The confusion occurred with the jury in that they were required to find an accident, which has a connotation of a singular event some moment in time. And in reality, what occurred and what was reported is that he was in his bunk room being tossed around for a period of about four hours. When he awoke and came up to the helm, he was seasick and he was having back pain. And so there was no incident that he could point to, and counsel for Appelli did an excellent job trying to exploit that in the jury charge and try to make it look like his report to the Coast Guard, which reported back pain, was inconsistent with the video or his inability to say, it was this hour when my back pain started and we were at this point in the water, which he simply could not do. And so I think because the questions were segmented as opposed to what I believe is contemplated in the Pattern of Fifth Circuit charge and the charge that we submitted to the court, it caused jury confusion and the remedy would be remand for a new trial on the negligence claims because I think that's separate from the maintenance and cure claim. The final issue I'd like to discuss was the court's decision to allow testimony from Dr. Applebaum regarding an MRI film that he purportedly examined and viewed himself. And I want to make clear that there's a difference between looking at the MRI report and looking at the film, and I think juries appreciate that, as do experts when they're examining a case. And what occurred here was Dr. Applebaum presented testimony where he did a comparison between a prior film and the one following this incident. He looked at the pre-employment physical from Parker Drilling, which on the report said no abnormalities cleared for full duty and compared it to the subsequent MRI following this incident. The problem was it was never disclosed or provided to plaintiff's counsel despite being in possession of defense counsel throughout the discovery process. It was obtained by the Pele's counsel and provided to its experts. It was subsumed in one of our requests for production, and it was never provided to us, so our experts were never provided the opportunity to do any type of... Did you all ask for a continuance when this came out? We did not. We were in the third day of trial and had already arrested. And the trial court applied a very strict four corners rule looking at the expert's report and designation, and in there it was vague that he had reviewed the MRI. It didn't indicate whether he had looked at the films or the report, and so it was surprise and unfairly prejudicial at the time of trial when it came to our attention that he, in fact, had possession of a film that none of our experts... No problem, and he says the prior MRI is worse than the subsequent. How could you not think he must be looking at a film because the report, you said, didn't find a problem? Understood, and that's why we were confused when it had never been produced to us. We thought he was just looking at the report and... I know it certainly was called for in the discovery, but did you specifically say, hey, where is this film that he must be looking at? We did not make that request prior to trial. In conclusion, I believe that these three points of error were plain error and constitute a reversible error that requires remand. I appreciate the court's time. Thank you. May it please the court. Matthew Popp for Defendant Appellee Shermie Marine, LLC. When you look at the material to the employer's decision to hire, there are two cases that speak directly to that here in the Fifth Circuit. The first is a 2005 decision, Brown v. Parker Drilling Offshore, and in that decision, the Fifth Circuit wrote, the fact that an employer asks a specific medical question on an application and the inquiry is rationally related to the applicant's physical ability to perform his duties renders the information material for the purpose of this analysis. So that was it. The analysis on the second prong, material to the decision to hire was, did they ask the question? Yes or no? JOUCH v. Nautical Services, Inc. came out in 2006, and it includes the language, if the vessel owner would have employed the seaman, even had the request of disclosure been made, concealment will not bar the seaman's recovery of maintenance and cure. That's a lot different than did you ask the question. And so the question becomes, what evidence do you assess when you make this analysis on material to the decision to hire? And the Brown gives the most simple, did you ask the question? But what is happening, what I see to be happening in the district courts is, they've gone to this, well, you would have hired him anyway. Defense of it, which requires, number one, everything to start off with the hypothetical question, well, if the applicant had answered yes, what would have happened? And then, but once you start down that line, you're into nothing but speculation and conjecture because obviously it never happened. So, well, what if he does answer yes? In this case, it was Clayton Bozier, day two of trial. He testified, if a guy answers yes, I mark him not fit for duty and he's not cleared and he will not be hired. We will wait to get the prior medical records and check and see from that physician, is there any work restrictions, are there any work restrictions, has he been released? Of course, that never happened. But assuming that if those come back and the doctor releases him and he's full duty, then yes, I'll go ahead and clear him. Now, after you get the initial reaction from the company, which is company-wide and is solid evidence, and in this case, Cherami Marine, they rely on the post-office medical examiner to determine whether or not he's cleared or not cleared for duty. So any yes answer, that person's not cleared for duty. So the hiring process is absolutely prevented and depending on what results come back, it's stopped. Now, one of the other issues in this case is he had a 2011 visit to a Dr. Zarzor and those records were Exhibit 15. In 2011, he complained of back pain for three years and he wanted treatment. Then later on, a couple years later, the medical records from Mosteller Medical Center, Exhibit 16, within that, within his application to the Coast Guard, he complains of a pinched nerve and that he's taken Flexerol and Lortab. So there's two separate indications of prior injuries. So the question becomes, on the analysis, if the employer shows, okay, I get a yes answer. Something happens. I don't give back the post-office medical examination. It's got a yes on it. I just stick it in the guy's personnel file and put him on a boat. If the employer can show through its procedures or through its practice that, hey, this post-office medical examination means something. For instance, I have another client. They have a risk management department. Every post-office medical examination is examined by the people in the risk department because even if the applicant answers no to everything, they look it over again just to see if maybe the medical examiner missed something. Like say the applicant says he has a prescription for pain medicine, but he was cleared fit for duty. They'll put a hold on it and say, no, no, we need to find out why he's taking pain medicine. So for the materiality prong, it's not, it shouldn't be, humble opinion, we're arguing, it shouldn't be whether or not they would have hired the guy because that takes you down a walk down hypothetical speculation lane about something that never happened, and that's the whole reason we're making the motion in the first place. Where it should stop is we have, we asked this guy, has he ever hurt his back? And once, if he says yes, there's a mechanism, there's a trigger for activity on our part to delay or prevent him from being hired. But the analysis should stop there. It should not track on to say, well, sure, sure, it's going to stop, but eventually if you get these records, wouldn't you have cleared him? Eventually, if he worked for two months, would you just say, oh, well, I guess he's fit and good to go? No, no, no. It needs to stop where there's definable activity that's based on valid evidence, not speculation, hypotheses, and all that. Do you want to be heard on whether we should even be considering the sufficiency of the evidence on the McCorpin defense? Because you didn't really argue it, but to me the Unitherm case is pretty clear, and it's kind of a hard stop, that we can't consider the sufficiency of the evidence when the error wasn't preserved. Well, I do agree with it, but for me this is the biggest issue in the case. So it's not a big issue whether or not we have the power to address a question? No, no, on that. Sort of fundamental, like if we don't have the power to do something, we shouldn't be doing it? I agree with you. I mean, the focus of my brief was not on that. But, no, I mean, procedurally, if that's the case, then that's the case. For future reference, that kind of matters, at least to me. Yes, Your Honor. Okay. And in Brown, the court did it with the first problem of corporeal analysis, intentional concealment. And it said that it is an objective standard, not a subjective standard, because if we let every seaman come in and say, oh, yeah, they asked the question, but I thought it meant this rather than that, it turns into a subjective, which would eviscerate the McCorporate offense. The same thing is happening with prong number two. But even if the court dismisses the appeal because it wasn't preserved, you can still speak to what is the proper evidentiary analysis on the second prong of the McCorporate offense as a general rule. Okay. We would say, well, you don't have the power to do something, but we'll do it anyway? Well, no, Your Honor. We don't have the power to hear this issue on appeal. Okay. And then that's usually kind of like period. That shuts the door. Okay. Well, that's typically how that works. Then I would ask that. Now, he's arguing we do have the power on plain error review, to be fair, to consider, you know, the arguments being made here. He's saying on plain error review we do have the power. So I want to be fair to that's the argument that's being made, which is why we've had this long discussion. But it does matter. Well, at the risk of stating the obvious, if procedurally he's not allowed to bring it up now because he didn't preserve it, then I fully agree with that. Okay. Good. Now, when you go to the MRI, the MRI, the undisclosed MRI, that is a discovery pretrial motion issue. It is not an issue to be brought up after two days of trial, the morning of the third day of trial before the witness is supposed to testify. And the report of the MRI was contained within the Parker, the certified personnel file of Mr. Bosarge when he worked at Parker Drilling Company. It's at page 54 out of 72. That made up Exhibit 21 at trial, which was admitted in evidence. Now, that was turned over to Planner's Council January 5, 2015, in the course of discovery. So they had the report since more than a year before trial occurred. The expert report of Dr. Applebaum was produced in the fall. And in two places in that expert report, he states, I have reviewed the MRI of the lumbar spine referencing the March 11, 2013, lumbar spine MRI. And then in the second spot, he talks about how he compares the bulges on the July 21, 2014, lumbar spine MRI with the March 11, 2013, lumbar spine MRI. All of the objection to him and being able to testify at MRI, that is a discovery pretrial motion issue. It's too late to bring it up at trial. Why wasn't the film produced? Other than the only thing I can speak to is that it came in and we knew we would want our expert to see it. So we sent it over to him. You didn't think the other time I'd like to see it too? Well, it's the film. It's not the report. And on a lot of occasions I go out and get the film myself because what it is is it's separate departments. They have a medical records department. They have a radiology department. So you're never going to get the film from the medical records department. You always have to go back to the radiology department and say, hey, we have this report of a film. Would you please send us the film? A lot of doctors don't really care about the report. They want to see the film. Correct. So we always go back and get the film. And if it wasn't produced, then it was inadvertently. It should have been. If it wasn't, it would be my mistake as trial counsel and not producing it during the course of discovery. But it had been out there the whole time, and if I went out and got it, they could go out and get it. I mean, there's a ---- It wasn't in your possession solely. It was a third party. You went and got it. Correct. And they sent me a copy. They didn't send me the original film. It's not like you're the only one that had it and you didn't give it to them. Correct, Your Honor. You went out and got it. But you didn't turn it over to them after you went and got it. Correct, Your Honor. And it's his film. Plaintiff's film. Yeah. So I guess he could have gotten it. But, I mean, you don't deny that you should have turned it over. I don't deny that at all. It's just one of those things. I wasn't hiding the ball, but it's one of those things where in the course of any given day, oh, I got the film. I'll get that over to the expert. And then you just don't think about it again. Now you will. I'm sorry? Now you will. Yes. Yes, Your Honor. Good. One less issue for future appeals. Yes, Your Honor. And then the prerequisite question of did an accident happen, there is nothing at all wrong with that. Because in a lot of cases there's no question an accident happened. It's witnessed. You see it. The guy's bleeding, broken leg, had something amputated traumatically. An accident happened. In this case, unwitnessed, and in other cases, unwitnessed, one guy saying it, and a load of evidence showing that nothing happened. And in this case it was unwitnessed. But do you think the jury was confused about the term an accident to encompass four hours of being knocked about versus like a car running into you, which is sort of an accident? Not at all. Okay. And the reason why is because he alleged in his complaint he got thrown up and down on his bunk one time. He alleged in court, oh, I got thrown up and down. Let's see. That's on page 1326 of the appellate record. He alleged in his complaint and at trial one accident, coming up off his bed one and a half to two feet and getting slammed down after leaving shallow water. This particular trip from 0600 hours to about 1500 hours, they're traveling out to rig 208. They have a plaintiff comes off duty at noon. At around three, plaintiff has a conversation with the captain to say, I'm pulling to stop work authority. We need to go back to shallow water. It's way too rough to travel. The captain says okay. They come back between roughly 1500 to 1615 hours. They're at standby at a platform. Tied off to the platform. They're hanging off. They're waiting. The captain gets a call around 4.15 p.m. from rig 229. Captain looks at the weather and says, I think it's safe to go. I'm going to go. They start up the engines. They start the unhooking process. Mr. Bossard, you can see on video that Mr. Bossard comes up with a wheelhouse for roughly three minutes and then he leaves. And his testimony was that on the way after leaving this platform, this tie off and leaving shallow water to go out, that's when I got raised up, slammed, hit my back. That's when I got hurt. He doesn't allege a whole this, that, three occasions, five occasions. I was getting banged around the whole time. He's got one thing in his complaint. He has a trial. His story changed because he said I got tossed up and I landed half in, half out of my bunk. On the accident report that he filled out, the U.S. Coast Guard reported marine accident injury or death, exhibit one, he writes that I was really seasick, vomiting a lot, and I noticed my back was hurting. He doesn't mention anything about getting tossed around his bunk. There's a location of accident. There's a specific activity. What did he testify to at trial? That he was in his bunk after he left the platform. He was in his bunk and he got thrown up and down. He didn't say I was in my bunk for four hours getting seasick and I realized my back was hurt? No. What was argued to the jury about what caused, when you knew his back was hurt and all of that? It was argued that he hurt his back after they left the platform going to the second rig, 229, and that basically there's no question an accident happened was the general gist of what I remember from closing arguments. But it was a discrete issue, episode, as opposed to four hours of being tossed around, sort of accumulating onto your back? Correct, Your Honor. Okay. And then the seasickness, if he had been entitled, I understand maintenance and cure for anything regardless, as long as it's during the voyage or whatever, regardless of cause, but how long would he be entitled to maintenance and cure for the seasickness? Maximum medical improvement. Which would be the next day, right? When he got on the platform. So like a day? A solid and then it's done, yes. That's not the claim here. The claim here is for much longer than that. No, well, he was paid maintenance and cure and advanced wages up until September 25, 2014. No, but my point is that if he's trying to defend the maintenance and cure point on a seasickness, that would only get him a day or two. That wouldn't get him months and months of, that's the back. The back is what would get maintenance and cure for any period of time that anybody would care about because you wouldn't have this whole lawsuit and all this stuff about one day of maintenance and cure. I know that. Correct, Your Honor. Okay. And in his deposition, he was impeached with his deposition. That turned into Exhibit Number 28. He testified his deposition that the accident happened approximately at 1.30 or 2.30 before they got to the platform entitled. So there was this, putting times aside, there was this event going back to shallow water and tying off deposition that happened before then, trial that happened after that. So that's why the judge was concerned about whether anything had actually happened. Yes, Your Honor. Other than maybe the seasickness happened, but as far as the back injury. Yes, Your Honor. And he also reported to Dr. Fink. As a traumatic event as opposed to a preexisting event. Yes, Your Honor. And he reported to Dr. Fink, one of the physicians along the way, that he hit a metal pole and was thrown out of his bunk, and there's no metal pole in his room. So to try to turn this into a, well, he reported a lot of, all the accidents at different times come to trial and say, nope, I got thrown up, thrown down, that's when I hurt my back. And we produced video. We have wheelhouse video and back deck video. We produced the wheelhouse video from 10 or 11 a.m. to 2 a.m. the next day. Solid time. So he says, well, after I hurt my back, I was up at the wheelhouse, we were having heated arguments with Captain Nelson, I must have been up there five or six times. The video didn't show any visits at all. Other times when he said that the seas were 12 to 14 feet, in his report, he said at 1,400 hours the seas were 12 to 14 feet. Pull up the back deck video. And I believe it was at, yes, the back deck video is exhibit, I want to say 18, it's either 18 or 19. 19. Back deck video is 19. At roughly 2.03 p.m. when he says it's 12 to 14 foot seas, you can see him walk out on the back deck with his hands in his pockets and he's wearing flip flops. And he's not holding on to anything. And my question to him at that time, great, you say there's 12 to 14 foot seas, I'm 6'7". Show me a wave out there that's two of me. And he could, oh, well, the camera distorts everything. So his whole story all along the way from the conditions to the time his accident happened to where, none of it made any sense. And I think the biggest thing is we have the wheelhouse video. And from noon to roughly midnight, Captain Nelson is on duty at the wheel because they're traveling out. Captain Nelson never comes off his seat 1 1⁄2 to 2 feet ever. And if a guy is truthful and he gets tossed up in his bunk 1 1⁄2 feet, that's not the only area on the boat where that occurs. Our expert. We have your argument. Your time is up. Oh, okay. Thank you, Your Honor. Thank you all. Thank you. Briefly, just to address two issues that counsel raised, looking at the Brown v. Parker drilling analysis and the McCorpin Doctrine, it's critical to look at the fact that there has to be a failure to disclose medical facts. And what counsel focused on was the yes or no questionnaire. And had the medical facts been disclosed in this case, it wouldn't have been a yes or no about the prior back pain from 2011 by itself. It would be the prior medical facts, which include the intervening MRI, which cleared him full duty, and the report read that it was normal. I would couple that with Apelli's own expert testimony from Dr. Applebaum, who says, looking at the MRIs, that neither of them were clinically significant. And the case cited by Apelli's, the LaPerouse v. Hercules and Parker drilling, 817 Southern 2nd, 149, out of Louisiana Court of Appeals, which denied a summary judgment in a McCorpin application where there was no evidence of a preexisting disability that would render the individual susceptible to future injuries. And here we have Apelli's own expert saying, the prior MRI from Parker drilling's application process was clear and did not render him susceptible to future injuries, and so there wasn't an undisclosed preexisting disability. There was years prior, back pain noted, he went and received medical treatment and intervening clearance through an MRI for the same type of work. And ultimately he was sent by Cherami to their own nurse practitioner who performed his own range of motion tests, physical examination, and when he was questioned, he was asked, do you make your determination based upon the questionnaire? And his answer was, no, it's coupled with my physical examination. And he was asked, if you were made aware of the intervening MRI, would that clear him through your physical process? And he testified yes. And yes, those are hypotheticals, but if you're going to look at the medical facts that were not disclosed, you can't just pick the medical fact from 2011. You have to pick everything that was not disclosed, including his clearance through an MRI which intervened the two items. The last thing I want to just point out is with respect to the jury verdict form, I believe Judge Owens addressed this in the Seymour v. Penn case in the inverse scenario where the verdict form was coupled together following the Pattern Fifth Circuit jury charge. And I think what occurred in this case is by dividing it up, it required the jury to make two separate findings where the allegation was on or about the date of this incident, he was traveling in rough seas, his stop work authority was ignored on multiple occasions, and he reported back pain when he came back upstairs. He could not pinpoint, admittedly, when this happened on the voyage and at what time, and he had stories about what he hit himself on in a dark bunk room. But I think that that was confusing and misled the jury in this case. So do you think if the jury had found he had hit something that they would have answered the question no, regardless of what time of day it was? I think because of the word accident and the way it was phrased, the jury thought that they were required to find something more in line with what the court described, a car accident, a vessel collision. What evidence was there and what argument was made that the jury didn't know? It's a continuum. It happened over a four-hour period. Having had the charge in the verdict form and already made our objection on the record in closing, I will acknowledge that I argued that there was an accident and the accident was in the bunk room he got tossed around. It wasn't one single thing that hurt my back. It was multiple impacts in the bunk room before coming back upstairs. You said it was multiple impacts in the bunk room. Yes, before coming back upstairs. And he did not recall what time that occurred or where they were in the voyage other than it was after his shift had changed. Thank you for your time. That concludes the arguments for the day.